IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

NAOMI ELLISON,               )
                             )
        Plaintiff,           )
                             )
v.                           )        CASE NO. CV417-008
                             )
ST. JOSEPH'S/CANDLER HEALTH  )
SYSTEM, INC.,                )
                             )
        Defendant.           )
_____)

## O R D E R

Before the Court is Defendant's Motion for Summary Judgment (Doc. 30), to which Plaintiff has responded. For the following reasons, Defendant's motion is **GRANTED**. Accordingly, Plaintiff's complaint is **DISMISSED**. The Clerk is **DIRECTED** to close this case.

### BACKGROUND

From August 2013 to October 2014, Plaintiff Naomi Ellison was a Patient Care Technician ("PCT") employed by Defendant St. Joseph's/Candler Health System, Inc. ("St. Joseph's").[1] (Doc. 32, Attach. 3 at 48.) As a PCT, Plaintiff worked as a non-licensed member of a nursing team and provided patients with routine bedside care. (Id. at 107-08.) Her tasks included bathing,

---

[1] Because the Court is considering Defendant's Motion for Summary Judgment, the Court will consider the facts in the light most favorable to Plaintiff. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

feeding, changing, and shaving patients. (Id. at 107-09.) In total, Plaintiff had nearly thirty years of experience as a PCT. (Id. at 105-06.)

As a member of a nursing team, Plaintiff was supervised by the Clinical Nurse Manager, Heather Heldreth, and Heldreth's direct supervisor, the Director of Clinical Care, D.A. Dewey Winkler. (Id. at 105; Doc. 32, Attach. 6 at 8.) In addition, Plaintiff was supervised each shift by the designated charge nurse on duty. (Doc. 32, Attach. 3 at 125.) Rebecca Floyd was the charge nurse supervising Plaintiff at the time most relevant to this case. (Id. at 105.)

On October 11, 2014, Plaintiff was working a night shift at Defendant St. Joseph's when she was involved in an altercation with Mary Gillingham, a nurse also working on Plaintiff's nursing team. (Id. at 133.) Plaintiff contends that Ms. Gillingham requested Plaintiff's help with a patient, but when Plaintiff arrived to help, Ms. Gillingham informed Plaintiff that her help was no longer necessary. (Id. at 133-34.) Plaintiff reports that as she was leaving the room, Ms. Gillingham said "I don't like working with n[******]." (Id. at 134.) According to Plaintiff, Ms. Gillingham made the statement twice. (Id. at 145.) Ms. Gillingham, however, denies ever making the statement. (Doc. 32, Attach. 8 at 78.)

Plaintiff alleges that she immediately reported the statement to Ms. Floyd and requested to leave for the rest of the shift. (Doc. 32, Attach. 3 at 134.) Ms. Floyd granted Plaintiff permission to leave. (Id.) Plaintiff alleges that shortly after she left the hospital she spoke with the House Supervisor Leslie Jones-Bennett and reported Ms. Gillingham's use of a racial slur. (Id. at 152.) At some point during the conversation, Ms. Jones-Bennett informed Plaintiff not to return to work until further instructed. (Doc. 32, Attach. 5 at 59.) Plaintiff contends that she specifically reported Ms. Gillingham's use of a racial slur to both Ms. Floyd and Ms. Jones-Bennett. (Doc. 32, Attach. 3 at 134, 152.) However, both Ms. Floyd and Ms. Jones-Bennett deny that Plaintiff reported the racial slur when complaining to them about the altercation. (Doc. 32, Attach. 4 at 100; Doc. 32, Attach. 5 at 46.)

On October 13, 2014, Plaintiff returned to work and met with Mr. Winkler to discuss the altercation with Ms. Gillingham. (Doc 32, Attach. 3 at 161-62.) Plaintiff contends that she immediately reported Ms. Gillingham's statement to Mr. Winkler. (Id. at 162.) Mr. Winkler, however, denies that Plaintiff made a specific report that Ms. Gillingham used a racial slur. (Doc. 32, Attach. 9 at 42.)

After meeting with Plaintiff, Mr. Winkler directed Ms. Heldreth to conduct an investigation into what happened between

3

Plaintiff and Ms. Gillingham. (Doc. 32, Attach. 6 at 46.) Per Mr. Winkler's instruction, Ms. Heldreth requested and received an account of the altercation from Ms. Gillingham. (Id. at 50.) Ms. Heldreth did not speak with Plaintiff about what occurred. (Id. at 77.) Ms. Heldreth also spoke with a number of employees that worked the evening of the altercation. (Id. at 52.) While many of the employees did not provide written statements, Ms. Heldreth did receive emails from Ms. Floyd and another nurse, Jada McNeely. (Id.) Ms. McNeely did not work the evening of the altercation, but provided an email that contained a list of various complaints about Plaintiff's work performance and attitude. (Doc. 32, Attach. 16.) Similarly, Ms. Floyd's email also included complaints about Plaintiff's work performance from patients and co-workers. (Doc. 32, Attach. 17.) At no point in the investigation was the Human Resources Department contacted and the use of the racial slur reported. (Doc. 32, Attach. 6 at 51.)

On October 29, 2014, Mr. Winkler and Ms. Heldreth met with Plaintiff. (Doc. 32, Attach. 6 at 77.) While the parties disagree as to the initial purpose behind the meeting, Plaintiff's employment was terminated at the meeting. (Doc. 32, Attach. 9 at 40.) At the conclusion of the meeting, Mr. Winkler provided Plaintiff with contact information for a position with an in-home care agency. (Id. at 77.)

4

Defendant contends that Plaintiff's termination was ultimately based on the patient and co-worker complaints that were detailed in the emails received by Ms. Heldreth during her investigation. (Doc. 32 Attach. 6 at 56.) According to Ms. Heldreth, the co-worker complaints made against Plaintiff detailed violations of Defendant's employee Co-worker Compact, an agreement signed by Defendant's employees that detailed appropriate workplace behavior. (Id. at 59.) Ms. Heldreth cited that Plaintiff violated numerous provisions of the Co-worker Compact including "look beyond your assigned task," "stay focused," and "conduct yourself as a professional." (Id. at 60.)

Although Defendant contends that the decision to terminate Plaintiff's employment was based on the patient and co-worker complaints made during its investigation of the altercation between Plaintiff and Ms. Gillingham, it is undisputed that Plaintiff had never previously received any complaints or written disciplinary actions. (Doc. 32, Attach. 11 at 4.) In fact, in her most recent employment evaluation, Plaintiff was given a "satisfactory" rating for her customer service. (Doc. 32, Attach. 9 at 87.) Ms. Heldreth contends that the complaints only came to light after she began asking the staff about the altercation. (Doc. 32, Attach. 5 at 63.)

Plaintiff contends that prior to the altercation she had previously reported that Ms. Gillingham was prejudiced against

5

African-American employees. (Doc. 32, Attach. 1 at 6-7.) Ms. Floyd recalled Plaintiff making vague reports that Ms. Gillingham was prejudiced, but never reported the complaints to any higher supervisor. (Doc. 32, Attach. 4 at 77.) Additionally, Plaintiff contends that Ms. Gillingham was previously involved in a similar altercation with another employee, Jeanette McKinnon. (Doc. 32, Attach. 10 at 2-5.) Ms. McKinnon was a PCT working at Defendant St. Joseph's when she was also fired after an altercation with Ms. Gillingham. (Id. at 4.) Ms. McKinnon alleges that Ms. Gillingham called her a "n[*****]" after she became frustrated with Ms. McKinnon. (Id. at 2.) Ms. McKinnon also claims that she immediately reported the racial slur to her supervisors. (Id. at 3.) Although Ms. McKinnon had different supervisors than Plaintiff, Mr. Winkler ultimately signed off on Ms. McKinnon's termination papers a few days after the incident. (Doc. 32, Attach. 30.) Defendant's proffered reason for Ms. McKinnon's termination was "violent behavior toward a co-worker." (Doc. 32, Attach. 10.)

On December 14, 2016, Plaintiff brought suit in the Superior Court of Chatham County and alleged that she was fired in retaliation for reporting racial discrimination. (Doc. 1, Ex. A.) On January 17, 2017, Defendant properly removed this case to this Court (Doc. 1) and is now seeking summary judgment (Doc. 30). Defendant contends that summary judgment is appropriate

because Plaintiff has failed to establish a prima facie case of retaliation or, alternatively, Plaintiff has failed to rebut Defendant's proffered reasons for her termination.

**ANALYSIS**

I.  <u>STANDARD OF REVIEW</u>

According to Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim of defense—on which summary judgment is sought." Such a motion must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." <u>Id.</u> The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56 advisory committee notes).

Summary judgment is appropriate when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). The substantive law governing the action determines whether an element is essential. <u>DeLong Equip. Co. v. Wash. Mills Abrasive Co.</u>, 887 F.2d 1499, 1505 (11th Cir. 1989).

As the Supreme Court explained:

> [A] party seeking summary judgment always bears the
> initial responsibility of informing the district court
> of the basis for its motion, and identifying those
> portions of the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with
> the affidavits, if any, which it believes demonstrate
> the absence of a genuine issue of material fact.

Celotex, 477 U.S. at 323. The burden then shifts to the nonmovant to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the nonmovant's case. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The Court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmovant. Matsushita, 475 U.S. at 587-88. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586. A mere "scintilla" of evidence, or simply conclusory allegations, will not suffice. See, e.g., Tidwell v. Carter Prods., 135 F.3d 1422, 1425 (11th Cir. 1998). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the Court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989).

## II. PRIMA FACIE CASE OF RETALIATION

"Title VII's anti-retaliation provision prohibits an employer from retaliating against an employee 'because [the employee] has opposed any practice made an unlawful employment practice' by Title VII, including discrimination on the basis of race." Hankins v. AirTran Airways, Inc., 237 F. App'x 513, 519 (11th Cir. 2007) (quoting 42 U.S.C. § 2000e-3(a)). In order to survive summary judgment on a retaliation claim, a plaintiff must be able to establish a prima facie case that she was retaliated against for engaging in protected conduct. Little v. United Technologies, Carrier Transicold Div., 103 F.3d 956, 959 (11th Cir. 1997). To do so, "the plaintiff must show that (1) she engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities." Id. In this case, there is no dispute that Plaintiff suffered an adverse employment action when her employment was terminated. Defendant, however, contends that Plaintiff's claim fails because she has not established either that she was engaged in a statutorily protected activity, or that there was a causal connection between the protected activity and the adverse employment action. The Court will consider Defendant's arguments in turn.

## A. Statutorily Protected Activity

Defendant first contends that Plaintiff has failed to establish a prima facie case of retaliation because Plaintiff is unable to show that she engaged in a protected activity when she reported Ms. Gillingham's alleged racial statement. It is true that "not every act by an employee in opposition to racial discrimination is protected." _Little_, 103 F.3d at 959 (11th Cir. 1997) (quoting _Silver v. KCA, Inc._, 586 F.2d 138 (9th Cir. 1978)). An employee engages in a protected activity by opposing "conduct that is made an 'unlawful employment practice' by Title VII." _Fields v. Locke Lord Bissell & Liddell LLP_, 1:07-CV-2984, 2009 WL 2341981, at *12 (N.D. Ga. 2009) (quoting 42 U.S.C. § 2000e-2). To establish that Plaintiff was engaged in a protected activity, she must be able to show that she had a "subjective good faith belief, as well as an objective, reasonable belief that her employer engaged in an unlawful employment practice when she opposed the practice." _Valdes v. Miami-Dade Coll._, 463 F. App'x 843, 846 (11th Cir. 2012).

In this case, there is no dispute that Plaintiff had a subjective belief that she was engaged in a protected activity. However, the parties heavily dispute whether Plaintiff had a reasonably objective belief that she was opposing an unlawful employment practice by her employer. Defendant argues that Plaintiff could not have had an objectively reasonable belief

because the single statement made by Ms. Gillingham—an employee that was not Plaintiff's supervisor—could not be properly attributed to her employer. After careful review, the Court cannot agree.

In its argument, Defendant essentially argues that the one comment made by Ms. Gillingham cannot be attributed to the Defendant as Plaintiff's employer. Defendant is correct that "a racially derogatory remark by a co-worker, without more, . . . and opposition to such a remark, consequently, is not statutorily protected conduct." Little, 103 F.3d at 961. In this case, however, Plaintiff has offered more evidence than a single remark made by another employee. In fact, Plaintiff has offered evidence that Defendant was aware of ongoing instances of racial discrimination. The evidence shows that Plaintiff had repeatedly reported to Ms. Floyd that Ms. Gillingham was prejudiced in the past. Moreover, Plaintiff has offered evidence that Ms. Gillingham was involved in a prior altercation in which it was also reported that Ms. Gillingham used racial slurs towards another African-American employee.[2]

---

[2] Defendant attempts to argue that evidence of the prior alteration between Ms. Gillingham and Ms. McKinnon is not probative in this case because different supervisors were involved in making the decision to terminate Ms. McKinnon's employment. This argument is unconvincing. Mr. Winkler signed the termination forms used to terminate Ms. McKinnon's employment. This fact, therefore, provides evidence that Mr. Winkler was aware of the alleged racial discrimination. See

Although Defendant disputes the relevance of Plaintiff's complaints to Ms. Floyd and the altercation between Ms. Gillingham and Ms. McKinnon, the burden to establish a prima facie case that Plaintiff was engaged in statutorily protected activity is not onerous. Here, Plaintiff has provided enough evidence to convince this Court that there is at least a genuine dispute of material fact as to whether Defendant knew of ongoing racial discrimination such that Plaintiff would have had an objectively reasonable belief that she was opposing discriminatory practices.

Moreover, the Court is unconvinced by Defendant's argument that Plaintiff could not have had an objectively reasonable belief that she was engaged in protected conduct because neither Ms. Gillingham nor Ms. Floyd was her supervisor. In Defendant's view, Plaintiff could not have reasonably thought that the racial discrimination could be imputed to Defendant St. Joseph's because her argument is based on the fact that only other employees, who had no power to terminate her employment, knew of the alleged discrimination.

After reviewing the record, this argument fails. Even if Ms. Floyd and Ms. Gillingham have no supervisory authority over

Jackson v. United Parcel Serv., Inc., 593 F. App'x 871, 877 (11th Cir. 2006)(stating that evidence of prior similar acts is admissible to show a decision-maker's "motive, intent, or knowledge").

Plaintiff, Plaintiff has still identified enough evidence to establish a prima facie case of retaliation. Plaintiff has provided evidence that Mr. Winkler signed the termination letter ending Ms. McKinnon's employment with Defendant St. Joseph's. This fact alone creates a genuine dispute of material act as to whether Plaintiff would have had an objectively reasonable belief that she was opposing racial discrimination known to her superiors. Because Plaintiff has identified that her supervisors may have known about prior claims of discrimination, Plaintiff has sufficiently shown that she reasonably believed she was opposing an unlawful employment practice by her employer when she reported Ms. Gillingham's racial comments. Accordingly, the Court is satisfied that Plaintiff has shown that she was engaged in a protected activity.

## B. Causal Connection

After finding that Plaintiff has identified evidence that she was engaged in protected conduct, the Court must now consider Defendant's argument that Plaintiff has failed to establish a prima facie case of retaliation because she cannot show a causal connection between her report of discrimination and her termination. In order to establish a causal connection, "a plaintiff need only show that the protected activity and adverse action were not wholly unrelated" Brungart v. Bellsouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000) (quoting

13

*Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999) (internal quotations omitted)). When considering whether an adverse employment action and a protected activity are wholly unrelated, courts generally consider whether "the decision maker was aware of the protected conduct at the time of the adverse employment action" and the temporal proximity between an adverse employment decision and the alleged protected activity. *Id.*

As a starting point, Plaintiff has identified evidence that her termination and report of Ms. Gillingham's discrimination are not wholly unrelated. Although disputed, Plaintiff has offered evidence that Mr. Winkler was aware of complaints concerning Ms. Gillingham's racial discrimination at the time he decided to terminate Plaintiff's employment. Additionally, Plaintiff was fired within twenty days of reporting the alleged discrimination to her supervisors. Both Mr. Winkler's awareness of instances of discrimination and the temporal proximity between Plaintiff's report of racial discrimination and her termination supports the inference that there was a casual connection between her complaint and her termination.

Defendant, however, contends that the complaints submitted by Plaintiff's co-workers are an intervening cause that broke the causal connection between her report of racial discrimination and her supervisors' decision to terminate her

employment. In support of this argument, Defendant relies on several cases where courts have found that actions by the plaintiff that occurred after the plaintiff's initial report of discrimination justified the adverse employment action taken against the plaintiff. See, e.g., Wu v. Se.-Atl. Beverage Corp., 321 F. Supp. 2d 1317, 1337 (N.D. Ga. 2004) (finding that costumer complaints made after the plaintiff filed a complaint with the Equal Employment Opportunity Commission were an intervening cause that showed there was no connection between a report of discrimination and the employee's termination). However, the facts of this case are fundamentally different. Here, Plaintiff contends that the co-worker complaints were created in retaliation of her report of racial discrimination. While some of the co-worker complaints were based on things that occurred after the report of racial discrimination, some of the complaints were based on things that were known before Plaintiff complained of discrimination. It is difficult, therefore, to conclude whether these complaints are actually an intervening cause that break the causal connection between her report of discrimination and her termination. At this stage in the proceedings, however, Plaintiff simply must prove that the decision to terminate her employment and the protected activity

are not wholly unrelated. For the purposes of this motion, the Court will assume that Plaintiff has met this burden.[3]

## III.    PROFFERED REASONS FOR RETALIATION

After considering whether Plaintiff has sufficiently alleged a prima facie case of discrimination to survive summary judgment, the Court must now consider whether Plaintiff has sufficiently rebutted each of Defendant's proffered reasons for her termination. Typically, when a plaintiff has established a

---

[3] Plaintiff alternatively attempts to establish causation by relying on a cat paw's theory of liability. Under this theory of liability, causation can be established by showing that an employee with a racial animus made a recommendation to a supervisor that caused the plaintiff's employment to be terminated. See Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999). Essentially, the supervisor acts merely as the "cat's paw" for the lower employee's discriminatory intent. Id. In this case, Plaintiff contends that Mr. Winkler and Ms. Heldreth were merely the conduits for Ms. Gillingham's and Ms. Floyd's discriminatory intent. After reviewing the evidence, the Court is unconvinced. First, the Court is skeptical that Plaintiff has identified any evidence that Ms. Floyd had any discriminatory intent when she filed her report with Ms. Heldreth. Moreover, a party can only rely on a cat's paw theory of liability when a supervisor has failed to conduct an independent evaluation and, instead, merely relied on the recommendation from the biased employee. See Hankins, 237 F. App'x at n.5. In this case, Ms. Heldreth and Mr. Winkler spoke with several employees, including Plaintiff, during their investigation. Accordingly, it appears that Plaintiff's termination was based on other factors outside of any biased employee's recommendation. This point is inapposite, however, as the Court has already assumed that Plaintiff has sufficiently established causation in order to establish a prima facie case of retaliation. See Hammett v. Sec'y, Dept. of Homeland Sec., 488 F. App'x 405, 407 (11th Cir. 2012) (declining to consider causation under a cat's paw theory of liability "where the district court assumed arguendo that Hammett had satisfied the causal element of her prima facie case of retaliation").

16

prima facie case of retaliation, a defendant is then given an opportunity to rebut any claim of retaliation by offering legitimate, non-discriminatory reasons for the adverse employment action taken against the plaintiff. See Chapman v. Al Transp., 229 F.3d 1012, 1024 (11th Cir. 2000) (quoting Tex. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55 (1981). Although defendant must offer non-discriminatory reasons for the adverse employment action, "the [defendant's] burden is merely one of production." Burdine, 450 U.S. at 255. The plaintiff, however, retains the burden of persuasion and must offer evidence to rebut any proffered reasons given for the adverse employment action. Id. at 256. A plaintiff can meet this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id. at 255. In determining whether an employer's proffered explanation is unworthy of credence, the Court must consider "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997). "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pre-textual, the employer is

17

entitled to summary judgment on the plaintiff's claim." Chapman, 229 F.3d at 1024-45.

In this case, Defendant contends that Plaintiff was terminated due to complaints regarding her ability to work with others and her treatment of patients. Although these complaints were obtained during the investigation into the altercation with Ms. Gillingham, Defendant argues that these complaints provided the non-discriminatory basis on which the decision to terminate Plaintiff's employment was made. Because Defendant's burden of production is not onerous, Defendant has sufficiently provided non-discriminatory reasons for Plaintiff's termination.

Now, the Court must consider whether Plaintiff has sufficiently rebutted each of Defendant's proffered reasons for terminating her employment. In an attempt to rebut Defendant's proffered reasons, Plaintiff provides four reasons as to why this Court should find Defendant's proffered reasons are pretext. Plaintiff cites (1) flaws in the investigation following the altercation with Ms. Gillingham; (2) Defendant's failure to follow its own procedures in handling the investigation; (3) the timing and alleged overstatements in Defendant's proffered reasons for Plaintiff's termination; and (4) Mr. Winkler's offer to refer Plaintiff to other similar positions. The Court will consider each of Plaintiff's contentions in turn.

Plaintiff first argues that this Court should find that Defendant's proffered reasons are pretext for retaliation because the investigation that revealed the complaints leading to her termination was flawed. Plaintiff alleges that the investigation was flawed because (1) Plaintiff was never interviewed by Ms. Heldreth about the altercation; (2) not all employees working the shift during the altercation provided written statements to Ms. Heldreth during the investigation; and (3) statements made by nurses that were not working during the altercation were considered in her termination. Ultimately, Plaintiff contends that these facts show that the investigation was designed simply to create a record of complaints that would support her termination.

The Court, however, does not agree. None of Plaintiff's identified problems with the investigation convince this Court that the investigation was so unfairly conducted that it should be considered evidence that Defendant's proffered reasons to terminate her employment are pretext. First, while Ms. Heldreth did not speak with Plaintiff in order to obtain her account of what occurred with Mrs. Gillingham, the evidence shows that Plaintiff had already provided such a statement to Mr. Winkler. Further, the Court is unconvinced that a failure to obtain written statements from everyone working the night of the altercation shows that the investigation was unfairly conducted.

Ms. Heldreth asked employees working during the shift for statements and took statements from those who wished to provide them. Finally, there is no evidence in the record to support the contention that Ms. Heldreth went specifically to nurses that were not working during the shift and requested statements about Plaintiff's conduct. Although Ms. McNeely provided a statement to Ms. Heldreth even though she was not working the night of the altercation, this fact does not show that the investigation was designed to create reasons to support Plaintiff's termination. In fact, Ms. McNeely testified that it was other employees, not Ms. Heldreth, that encouraged her to provide the email full of complaints about Plaintiff's workplace behavior. (Doc. 32, Attach. 19 at 40.) Ultimately, these facts do not support Plaintiff's contention that Ms. Heldreth's investigation was so fundamentally flawed that it creates a genuine dispute of fact that the proffered reasons for Plaintiff's termination were pretextual.

Relatedly, Plaintiff also contends that this Court can find evidence of pretext by the fact that Defendant failed to follow its own policies when handling this matter. Plaintiff argues that after she reported the racial slur to her supervisors, the resulting investigation should been turned over to the Human Resources Department for further investigation. Plaintiff argues that the fact that the investigation was handled instead by Ms.

Heldreth is evidence that it was designed to create reasons to support her termination.

Again, the Court is unconvinced that the failure to turn this investigation over to Human Resources is evidence of Defendant's discriminatory intent. It is true that a failure to comply with internal policies can sometimes be evidence of pretext. See, e.g., Bass v. Bd. of Cty. Comm'rs, 256 F.3d. 1095, 1108 (11th Cir. 2001) (discussing that an employer's deviation from its standard procedure may be evidence of pretext), overruled in part by Crawford v. Carroll, 529 F.3d 961 (11th Cir. 2008). In this case, however, referrals to the Human Resource Department only were mandatory when an employee was placed on administrative leave. (Doc. 30, Attach. 20.) While the parties dispute whether Plaintiff was placed on administrative leave when Ms. Jones-Bennett informed Plaintiff not to come into work until further instructed, there is no clear determination that this case should have been referred to Human Resources. (Doc. 32, Attach. 9 at 38-9.) Moreover, Defendant's policies state that employees can be immediately terminated for violating provisions of the Co-worker Compact. (Doc. 30, Attach. 20.) Because there was no blatant disregard for internal policies, the Court is unpersuaded that the failure to refer this investigation to Human Resources is evidence that Defendant's

proffered reasons for Plaintiff's termination are unworthy of credence.

Next, Plaintiff contends that this Court should conclude that the timing and alleged overstatement of Plaintiff's violations of the Co-worker Compact is evidence that Defendant's proffered reasoning for Plaintiff's termination were pretext for an actual discriminatory motive. In regards to timing, it is undisputed that Plaintiff had no prior complaints from patients or co-workers before the incident with Ms. Gillingham. Plaintiff argues that the volume of complaints that were submitted shortly after she reported Ms. Gillingham's statement should be evidence that the complaints were created to support her termination. The Court, however, does not agree. It is expected that an investigation may turn up complaints that would otherwise be unreported. The timing of the complaints alone is not enough to create a genuine dispute of material fact that Defendant's given reasons for her termination were pretext.

To further support her contention that the timing of the complaints is suspicious, Plaintiff also cites that Ms. Heldreth overstated Plaintiff's violations when citing reasons for her termination. Plaintiff contends that there was no evidence in the emails to support some of the specific provisions of the Co-worker Compact Ms. Heldreth cited as the basis for Plaintiff's termination. For example, Plaintiff contends that none of the

emails related to the Co-worker Compact provisions of "perform your work in a timely manner," "pay attention to details," and "stay focused," but these provisions were still cited as some of the basis for her termination. As a result, she contends that this Court should be suspicious of all of Defendant's proffered reasons.

Again, the Court cannot agree with Plaintiff's assertion that there is evidence of pretext simply because Defendant cited various provisions in the Co-worker Compact that seem unrelated to the evidence provided in the various complaints. First, the provisions that Plaintiff highlights as unsupported are vague and subjective. It is nearly impossible to tell which of the cited provisions actually relate to the complaints detailed in the emails received during the investigation. More importantly, however, Plaintiff's argument misses the point. Here, the Court is concerned with whether the employer actually believed the complaints offered and if that cited reasoning is worthy of credence. In this case, Plaintiff has failed to identify any evidence that Mr. Winkler or Ms. Heldreth did not actually believe the complaints discovered during the investigation. As a result, Plaintiff has failed to show that the alleged overstatement of Plaintiff's violations of the Co-worker Compact is sufficient to establish that Defendant's given reasons for her termination were pretext.

Finally, Plaintiff cites Mr. Winkler's offer to provide her with contact information with another similar position as evidence of pretext. Plaintiff contends that if Mr. Winkler honestly believed that the patient complaints were true, then he would not have been willing to refer her for another position where other vulnerable patients would be under her care. Defendant attempts to refute this point by arguing that Mr. Winkler was referring her to a position that was fundamentally different than her position as a PCT on a nursing team.

In the Court's view, Mr. Winkler's offer to put Plaintiff in contact with another position is inherently contradictory. Defendant specifically cited that Plaintiff was terminated due to some complaints that she mistreated patients. It is inconsistent for Defendant to cite Plaintiff's work with patients as a problem, while also providing her with contact information for a similar position that would allow her to have direct patient contact. The Court concludes that this evidence is enough to establish that Mr. Winkler may not have actually believed the reported patient complaints.

Although Mr. Winkler's offer provides evidence contradicting at least one of Defendant's proffered reasons for Plaintiff termination, his statement does not in any way refute the contention that Plaintiff was fired for her inability to work well in a group setting as required by the nursing teams at

Defendant St. Joseph's. In order to survive summary judgment, Plaintiff must be able to prove that every one of Defendant's proffered reasons is pretext for an actual discriminatory motive. In this case, Plaintiff has failed to provide any evidence that her supervisors did not honestly believe the co-worker complaints about Plaintiff's ability to work well with others. As a result, Plaintiff's claim cannot survive summary judgment.

## CONCLUSION

Although Plaintiff has likely established a prima facie case of retaliation, Plaintiff has failed to create a genuine dispute of material fact that Defendant's proffered reasons for her termination were pretextual. As a result, Defendant's Motion for Summary Judgment is **GRANTED** (Doc. 30) and Plaintiff's complaint is **DISMISSSED**. The Clerk is **DIRECTED** to close this case.

SO ORDERED this *30th* day of January 2018.

WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA